UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA

          - against -                                S3 07 Cr. 115 (AKH)

ABDUL TAWALA IBN ALI ALISHTARI,

                Defendant.
-------------------------------------------------------------x

# DEFENDANT ABDUL TAWALA IBN ALI ALISHTARI'S SENTENCING MEMORANDUM

Respectfully submitted,

Richard H. Rosenberg, Esq.
Attorney for Defendant
217 Broadway, Suite 707
New York, NY 10007
Tel:   (212) 586-3838
RichRosenberg@msn.com

Daniel S. Parker, Esq.
Attorney for Defendant
331 Madison Avenue, 15th floor
New York, New York   10017
Tel:   (212) 239-9777
DanielParker@aol.com

# RICHARD H. ROSENBERG
ATTORNEY AT LAW

217 BROADWAY  
SUITE 707  
NEW YORK, NEW YORK 10007

TEL: 212-586-3838  
FAX: 212-962-5037  
richrosenberg@msn.com

April 6, 2010

Hon. Alvin K. Hellerstein  
United States District Court  
Southern District of New York  
U.S. Courthouse  
500 Pearl Street  
New York, New York 10007

### Re: United States v. Abdul Tawala Ibn Ali Alishtari
### S3 07 Cr 115 (AKH)

Dear Judge Hellerstein:

The defendant Abdul Tawala Ibn Ali Alishtari (the "defendant" or "Mr. Alishtari") respectfully submits this letter and annexed exhibits in advance of his sentencing currently scheduled for April 15, 2010.

In requesting that the court sentence him pursuant to 18 U.S.C. § 3553(a) to a "sufficient but not greater than necessary" sentence; the defendant urges the court, for the reasons contained herein, to sentence him to less than the 121 month sentence recommended in the Pre-Sentence Report ("PSR")[1] and less than the 121 - 151 month range as calculated under the sentencing guidelines.

Although Mr. Alishtari admittedly engaged in criminal behavior for which he has accepted responsibility, the severity of his crimes and the acts which he committed are miles apart from the core of a man who spent years building a business and promoting peace.

As the court was made aware by the extensive plea allocution this case is truly unique. As will be discussed herein, with respect to the "material aid" to terrorism plea, the defendant admitted "consciously avoiding" integrating certain representations made to him by the undercover during the course of the government sting. Moreover, the government has stipulated that in its view, the "terrorist enhancement" does not apply in

---

[1] See recommendation at page 30 of the revised PSR dated December 23, 2009.

1

the guideline calculations for this offense. With respect to the fraud conspiracy, the defendant admitted guilt and allocuted that his fraud crimes were completely unrelated to the material aid to terrorism charges. The cold print of the indictment created an image of an individual far darker than the person Mr. Alishtari actually is. He is an American who loves this country and who had never been convicted of any crime prior to admitting guilt for the ones charged in this indictment. In determining an appropriate sentence in this case, the court should bear in mind that Mr. Alishtari, while fully and remorsefully accepting responsibility, is not a terrorist or a terrorist-sympathizer.

## INTRODUCTION

The defendant, an American entrepreneur and businessman, regrets his actions in committing fraud and in mismanaging funds he received from investors for his business, regrets the harm he caused these investors, regrets the decision he made to assist the undercover officer in transferring funds that the undercover represented were intended to be used to aid a terrorist training camp, regrets that he was so desperate to resuscitate his failed business that he engaged in conduct that was an anathema to his life's work and values, and regrets that in so doing he destroyed his life's work and reputation and caused harm to the reputation of other people of his faith who he so desperately sought to help during his life.

He is extraordinarily remorseful for his acts, yet his contrition does not extend to wrongs which may have been mis-attributed to him and thereby used to besmirch his lifelong efforts at helping Muslims and others as well as promoting global peace.

Mr. Alishtari, an entrepreneurial businessman, had spent more than 20 years attempting to build a debit card system which would permit users to engage in financial transactions without interest – namely a "flat" (meaning no interest) electronic data interchange ("FEDI"). This system was designed to be particularly attractive to observant Muslims who believe that they are prohibited by Islam from engaging in certain types of financial transactions that they believe are usurious. His entrepreneurial platform and the use of debit cards was an idea far ahead of its time when defendant began developing it in the late 1980's. In pursuit of this goal, Mr. Alishtari obtained a patented method of encryption that was intended to provide individuals with security from identity theft at a time when identity theft security was severely lacking and computer-invasive crime was on the verge of monumental expansion.

The patent, approved in 2003 (copy annexed hereto as Exhibit A), was originally written by Jeffrey Ice and filed in 2000. Mr. Ice sold the patent to Merchant On Line, a now defunct public company involved in debit card issuance. Mr. Alishtari had licensed Merchant On Line to service his debit cards and later obtained the patents when Merchant On Line went into bankruptcy.

A by-product of Ice's single use, patented encryption method, and one of its features that made it attractive to potential users who were concerned about identity theft, was that the identity of the user would not be revealed. During the investigation, in a meeting that was secretly video-taped by the FBI, Mr. Ice joined Mr. Alishtari for a business presentation to the undercover agent that featured a business plan and debit card and terminal prototypes used to complete a secured transaction. Mr. Ice enthusiastically explained the operation of the system in a straightforward businesslike manner  There was no suggestion of illicit use of the system by the undercover or by Mr. Ice or Mr. Alishtari. The purpose of the meeting was to demonstrate the uniqueness and value of the system in the hope that the undercover's wealthy family would invest in the completion and marketing of the system.[2]

Mr. Alishtari's endeavors over the years to develop a flat data interchange were not a fraud or a "scheme."  Mr. Alishtari employed many hardworking people, in multiple locations, as part of his business ventures. He legitimately, and with honest intentions, spent millions of his investors' dollars developing the debit card system in pursuit of his business plan and visionary dreams. At one point, Mr. Alishtari funded Rising Star, a Florida company which employed approximately 30 people -- many of whom had government backgrounds and were computer experts, engineers, and administrative assistants -- all working to build defendant's visionary business. The Government has investigated Rising Star, inspected its physical plant, interviewed many, if not all, of Rising Star's key employees, reviewed Rising Star's books and records, and combed through its tax returns. It is apparent that Rising Star – funded by defendant with investors' money -- was a company designed to fulfill the very purpose for which the investments were made. Annexed hereto as Exhibit B is a detailed letter from Kooge Kweli, Rising Star's co-founder and CEO, explaining and describing Rising Star's development and its interactions with the defendant.

Unequivocally, fraud was committed and money was mismanaged; i.e. money was spent on projects other than that for which it had been raised, or at times the progress of the venture was exaggerated, and misrepresentations to investors were made. Co-defendant Brian Anderson, who was introduced to the FEDI investment program through a third party in Canada in 2002,  raised money for FEDI by falsely representing FEDI as "commodities desks" to investors without Mr. Alishtari's

---

[2]  Further support for the validity of Mr. Alishtari's efforts to develop an electronic data interchange can be gleaned from Mr. Ice's efforts to re-gain control of his patent in 2007. In 2007, Mr. Ice sued Mr. Alishtari in the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida under case number 07-CA-4735, for breach of contract based upon a 2003 agreement between the parties wherein Mr. Ice agreed to act as a consultant to Mr. Alishtari's electronic data interchange company. Because Mr. Alishtari was incarcerated on this case at the time of the lawsuit, Mr. Alishtari defaulted in the civil action and Mr. Ice acquired ownership of his patents as a result of the judgment.

3

knowledge.[3] Admittedly, some of that money ended up in Mr. Alishtari's bank account. An investigation conducted by the British Columbia Securities Commission ("BCSC") dated April 25, 2007 revealed that Anderson, who had committed multiple frauds, raised approximately $4 million purportedly for FEDI. Of that, only about $375,000 went to FEDI, while the rest went directly to Anderson. (See ¶ 32 BCSC Findings annexed hereto as Exhibit C.)

Mr. Alishtari did not simply misuse investor funds to enrich himself or to live a "lavish" lifestyle. In fact, millions of dollars were properly spent developing the system as well as for other business costs, including salaries, rent, insurance, administrative expenses and legal costs. A fleet of Mini Cooper cars were used as company cars. Salaries were paid to the defendant and others as part of the business of developing FEDI. A few relatively inexpensive country club memberships were paid for so that customers could be wooed. Hundreds of thousands of dollars were expended in legal fees to successfully recover investor funds from three companies, Standard Reserve, E-Gold.com, and E-Bullion.com, that wrongly retained these investor funds.

With regard to the charge of attempting to finance and render material support to terrorism, simply put, the defendant is not a terrorist. He never intended to aid terrorism. He was not predisposed to funding terrorism. He has never engaged in anti-American vitriol or spouted pro-terrorist sentiments. He is a pacifist and a founder of the Global Peace Film Festival, Inc., ("GPFF") a non-profit organization founded in 2003 and dedicated to promoting peace through the median of film.[4] Although he may have wrongfully diverted investor money to fund the Global Peace Film Festival, his motive in doing so is a reflection of his pacifist beliefs.

In or about September 2005, the government began tape-recording conversations between Mr. Alishtari and his former accountant, Aqeel Khan, turned government informant. Khan subtly and continuously pressured Mr. Alishtari to meet with the undercover, complaining to Mr. Alishtari about his own financial problems, in part because Mr. Alishtari owed Khan money, and then telling Mr. Alishtari that he knew people from a wealthy Pakistani family (the undercover's family) who had come to his rescue in the past by loaning him $50,000. Khan suggested that Mr. Alishtari meet this man who could potentially assist both of them.

At the time, Mr. Alishtari had been forced to sell his house and most of its furnishings. He was living with his wife and two children in a cramped two-bedroom

---

[3]     Mr. Alishtari did not meet Mr. Anderson until 2003.

[4]     The GPFF is currently sponsored by such entities as Avon, Kodak, Florida Office of Film and Entertainment, Orlando Downtown Development Board among many others. A copy of the Global Peace Film Festival 2009 Program is attached hereto as Exhibit D.

4

apartment situated above a pizzeria in Ardsley, New York. He had no savings. He had no money. He owed Khan money for a loan that Khan had given his business. He owed other people money. He owed the Internal Revenue Service approximately $18,000 in back taxes, which he repeatedly discussed with Khan.

It was at this critical juncture in Mr. Alishtari's life that the undercover seemingly offered him a cure-all to his problems. In meeting after meeting, conversation after conversation, the undercover -- purportedly lacking familiarity with U.S. business practices and customs represented that he was prepared to invest tens of millions of dollars with the defendant if Mr. Alishtari could prove his *bona fides* by wiring sums of money from New York to certain designated bank accounts. Mr. Alisthari knowingly and willingly wired approximately $152,000 provided by the undercover under false and fictitious pretenses.

However, in not one of the 114 separately recorded telephone conversations between Mr. Alishtari and Khan and the undercover, did they discuss aiding or attempting to assist any terrorist organization. The overwhelming majority of those telephone calls represented discussions about Mr. Alishtari's business, his financial plight, and arrangements to get together with the undercover -- with the first meeting between Mr. Alishtari and the undercover taking place in June 2006.

The financing terrorism allegations in this case were based on brief and almost *sub vocal* suggestions by the undercover agent to Mr. Alishtari that money was needed, inter alia, to buy equipment such as night vision goggles and destined to go to a generic "terrorist training camp" – not, for example, to go to any specifically denominated group or to a designated entity that is prescribed by statute.[5]

As previously noted, during the course of its investigation, the FBI secretly recorded 11 person-to-person meetings – some of which last approximately six hours -- between the defendant and the undercover officer in addition to the taped telephone calls.

What is readily apparent is that the overwhelming majority of the time the meetings between the defendant and the undercover reflect conversations between two men with differing agendas: the undercover attempting to get the defendant to assist him to secretly move money and the defendant attempting to get the undercover to invest in his business. In exchange for his assistance, the undercover persuaded Mr. Alishtari that not only was he interested in Mr. Alishtari's business acumen and advice, but that his family was interested in investing tens of millions of dollars in Mr. Alishtari's then-dormant debit card platform as well as other ventures. The undercover repeatedly and continually offered investments ranging from $5 million to $100 million – all conditioned upon the defendant's ability to move money which the undercover

---

[5]    See 18 U.S.C. § 2339B

5

represented was eventually destined for unspecified terrorist training camps. Unfortunately, Mr. Alishtari readily agreed to help.

However, and of critical importance, although FEDI was a system designed to move money, it was never designed to move money for terrorist purposes, and was never used as such. Since preventing identity fraud was a major component of the system, maintaining confidentiality of the sender was a key and necessary security feature of FEDI.

Prototypes of Mr. Alishtari's debit card system were designed by Mr. Alishtari as far back as the early 1990's, long before "the war on terror." Mr. Alishtari's purchase of Jeffrey Ice's patent from Merchant On Line was intended to further the debit card feature of his envisioned "flat" exchange. FEDI was never intended to be used to assist anyone for terrorist purposes and when the defendant initially met with the undercover, he harbored no intent to fund terrorism. Any allegation to the contrary could not be further from the truth.

## PROCEDURAL HISTORY

On August 28, 2008, pursuant to a plea agreement with the Government, co-defendant Brian Anderson was permitted to plead guilty to wire fraud conspiracy and substantive wire fraud in connection with one of his originally charged frauds, the "Frontier Assets" fraudulent loan investment program, in satisfaction of all the charges against him. Anderson did not plead guilty to his crimes of fraud with respect to FEDI or the Martin de Porres International fraud or with respect to his conspiracy to launder fraudulently obtained proceeds through a series of international banks as originally charged in the indictment. In addition, in consideration of his plea, the Government did not prosecute Anderson's wife and his daughter, Bonnie Dick, who was arrested and prosecuted, was permitted to enter into a cooperation agreement with the Government. She has not been sentenced. Both Anderson's wife and daughter received substantial assets as part of Anderson's frauds.

Anderson was sentenced to a period of 90 months by this Court on January 15, 2010, a sentence 7 months below the minimum guideline calculations of 97 - 121 months.

On September 29, 2009, Mr. Alishtari pleaded guilty before Your Honor pursuant to a Plea Agreement (the "Agreement") dated September 23, 2009, to a two-count Information charging him with Financing Terrorism in violation of 18 U.S.C. §§ 2339C and 2 as well as a Conspiracy in violation of 18 U.S.C. § 371. In the plea agreement, the government acknowledged that what is commonly referred to as the "Terrorism Enhancement" pursuant to U.S.S.G. § 3A1.4 did not apply in this case because the government was not able to show that the defendant's acts were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate

against government conduct." 18 U.S.C. § 2332b(g)(5). *(See Footnote 1 at page 3 of the plea agreement)*

The parties also agreed that although Mr. Alishtari did not *intentionally* help fund terrorist activity, he deliberately and "consciously avoided" confirming that there was an obvious and high probability that the funds that he agreed to move were to be used to materially support unspecified terrorist activity.

In essence, the defendant admitted that he turned a blind eye to the undercover's few overt representations that the money defendant helped transfer was ultimately destined for unspecified Pakistani or Afghanistan terrorist training camps. Despite the fact that the defendant never shared any intent to aid terrorists, the parties agree that the statute was violated when the defendant transferred funds under these circumstances.

During the defendant's lengthy allocution, it also became clear that defendant's financial business venture was never designed, or intended to be used, to aid terrorism. Indeed, the defendant admitted that he committed fraud and that portions of investor funds were raised or maintained upon exaggerated representations or used for purposes other than the stated reasons why investors had agreed to invest.

## THE GUIDELINE CALCULATIONS

### A. The Guideline Calculations:

Under Count One:

    Pursuant to U.S.S.G. § 2M5.3(a), the Based Offense Level is:    26

    Because the offense involved the provision of funds or other material support or resources with the intent, knowledge, or reason to believe that they were to be used to commit or assist in the commission of a violent act, then pursuant to U.S.S.G. § 2M5.3(b), two levels are added:    +2

    **The applicable Guideline Offense Level for Count One is:**    **28**

Under Count Two:

    Pursuant to U.S.S.G. § 2B1.1(a)(2), the base offense level is:    6

    Because the offense involved a loss amount of more than $7 million and less than $20 million, pursuant to U.S.S.G. § 2B1,1(b)(1)(K), 20 levels are added:    +20

| | |
|---|---:|
| Because the offense involved at least 50 victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(B), two levels are added: | +4 |
| Because the offense involved sophisticated means, pursuant to U.S.S.G. § 2b1.1(b)(9), two levels are added: | +2 |
| Because the defendant was an organizer, leader, manager or supervisor in a criminal activity, pursuant to U.S.S.G. § 3B1,1(c), two levels are added: | +2 |
| **The applicable Guideline Offense Level for Count Two is:** | **34** |

**Grouping Analysis:**

Pursuant to U.S.S.G. § 3D1.2, each count comprises its own separate Group;

Pursuant to U.S.S.G. § 3D1.4, the highest offense level is 34, which constitutes one Unit. The offense level of the other count is 5 to 8 levels less serious than level 34, and therefore it constitutes 2 of an additional Unit, resulting in a total of 1 and ½ Units, which results in 1 additional offense level pursuant to U.S.S.G.§ 3D1.4    +1

**Hence, the applicable Guidelines Offense Level for Counts One and Two is:**     **35**

Because the defendant accepted responsibility for his acts in a timely manner, pursuant to U.S.S.G.§§ 3E1.1(a) and (b), three levels should be subtracted:    -3

**Defendant's Adjusted Offense Level is:**     **32**

### B.   Defendant's Criminal History Category

The Defendant has no Criminal History. This case represents the only time he has ever been arrested. Accordingly, he has no criminal history points and a Criminal History Category of I.

### C.   Guideline Sentencing Range

Based upon a Criminal History Category of I and an Adjusted Guideline Level of 32, the defendant faces a sentencing guideline range of between 121 and 151 months (the "Stipulated Guideline Range").

It is important to note that the maximum statutory sentence for Count Two, 18 U.S.C. § 371 is five years (though the applicable guideline level far exceeds the statutory maximum). However, pursuant to U.S.S.G. § 5G1.2(d) and the plea agreement, the parties agree that the Court can impose consecutive sentences on Counts One and Two to the extent necessary to produce a combined sentence equal to the total punishment called for under the Guidelines. *(See Plea Agreement Page 5, Footnote 2. )*

Despite this analysis, and the applicability of U.S.S.G. § 5G1.2(d) in calculating the guideline sentence, the parties agree that this calculation "... does not limit the Court's ability to impose a non-Guidelines sentence." ( *See Plea Agreement Page 5, Footnote 2. )*

For the reasons that follow, we urge the court to impose a non-guideline sentence.

## A NON-GUIDELINE "REASONABLE" SENTENCE

### A.   18 U.S.C. § 3553 (a)

As set forth in 18 U.S.C. § 3553:

"(a)   The court shall impose a sentence sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed ---
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most cost effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for

9

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines...
>
> (5) any pertinent policy statement....
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense."

1. **The Nature and Circumstances of the Offense and The History and Characteristics of the Defendant**

    A. **The Circumstances of this Case**

    The circumstances of this case have been described in detail above.

    B. **Defendant's History and Character**

Mr. Alishtari will turn 57 years old three days before sentencing. Prior to this case, he had never been arrested, convicted of a crime, or so much as received a speeding ticket. He has been married to Diosa Cortes for 24 years and together they have two children, one biological and one adopted. Mr. Alishtari was born in Manhattan, raised in New York City, graduated Rice High School and attended four years of college at City College of New York. Despite not receiving an undergraduate degree, Mr. Alishtari completed an academic certificate in underwriting and banking from NYU Graduate Center.

Born Michael Mixon, Mr. Alishtari was estranged from his father most of his life as a result of his father's physical abuse of his mother, Betty Lou Jones Hanson. Although he reconciled with his father prior to his father's death in 1999, Mr. Alishtari was raised with the assistance of his godmother, Mattie DeLeon and godfather, Eddie DeLeon. After his godfather passed away, Mr. Alishtari was brought by his godmother to live with his mother. Unfortunately, his mother's second husband, Clarence Lammie, did not treat her children well, assaulting Mr. Alishtari on multiple occasions. Once, when Mr. Alishtari was about 13 years old, his stepfather struck him so hard in his left ear that he suffered a permanent hearing loss. In about 1967, Mr. Alishtari was present in the house when Mr. Lammie shot and wounded Mr. Alishtari's mother. He then abandoned her with eight children.

As a child, Mr. Alishtari formed a bond with his paternal grandfather Elijah Mixon, who served as a support figure and religious inspiration to him. As a result of this relationship, and to fulfill a promise he made to his grandfather when he was alive, in

approximately 1963, Mr. Alishtari began practicing Islam, became more observant, and began to refer to himself as "Tawala." He officially changed his name in 1996.

Currently, Mr. Alishtari's mother suffers from Alzheimer's disease and resides with one of her daughters in Atlanta. Alishtarti's godmother suffers from terminal cancer and is in a nursing home. Mr. Alishtari's wife, Diosa, continues to suffer from depression, which has been exacerbated by her husband's incarceration, her financial condition, and the responsibility of being a single parent to their sons, Abdur Raheem aged 15 and Shahar, aged 17.

Mr. Alishtar's suffers from multiple health problems as well, including Type II diabetes, high blood pressure, and depression. His psychological issues pre-dated his incarceration and in the past, he has seen a psychologist and mental health clinicians. Currently, he takes approximately 6 to 7 prescriptive medicines per day to address his medical conditions.

Despite his challenging childhood, Mr. Alishtari educated himself and secured employment, working for a New York State Assemblyman from 1976 to 1980, working thereafter selling educational products, working for a real estate investment firm, and working as a transportation bank underwriter until he started his own business in 1989.

Aware of the difficulties that some observant Muslims faced in engaging in financial transaction, and armed with the belief that he could remedy these problems while succeeding in business, Mr. Alishtari became an entrepreneur. It was in the course of raising money to develop his FEDI and attempting to build his platform that Mr. Alishtari suffered multiple setbacks that significantly impeded his success.

While developing his business, Mr. Alishtari – a prolific writer and orator – worked on a variety of projects which inspired many other people as well as left many to view him as a humanitarian and political and religious visionary. He wrote poetry, held and directed behavioral training seminars designed to foster communication between religions, founded the Global Peace Film Festival, and pursued lofty humanitarian goals. (Attached hereto as Exhibit E is a copy of a poem published in October 2005, by PoetsAgainstWar.com, written by Mr. Alishtari, entitled, "A Modern Peace Poem"). It is for precisely those reasons that his participation in the crime proposed by the undercover is so alien to Mr. Alishtari's character.

Also annexed to this submission are a series of letters from the defendant (Exhibit F ), his wife, Diosa (Exhibit G), his children, Shahar (Exhibit H ) and Abdur-Raheem (Exhibit I ) as well as other family members and former colleagues ( Exhibits J - N ) who describe Mr. Alishtari, provide insight into his background, and confirm the validity of his efforts to build FEDI.

Leonard Burg, a close personal friend and student administrator at Pace University and Vice President of an interfaith, non-governmental organization, A Centre

for World Religions, writes, "... On behalf of those who know and love Mr. Alishtari, we ask you consider his time spent as sufficient to punish him – not for being a terrorist sympathizer, which he is clearly not B but for having exercised poor judgment in his business associations, in his zeal to achieve economic development for his community." ( Exhibit J).

Larry Mitchell, a former Department of Defense subcontractor and former U.S. Navy serviceman, who subsequently was employed at Rising Star, writes:

"In the process of working to deliver solutions that would allow the morally centered and spiritually devout to go online and transact in ways that did not compromise their values, integrity and beliefs, led by AT (Mr. Alishtari), we endeavored to bring to market solutions that included a web filter, a custom filtered web browser... a web café complete with remote access ... and a web kiosk..."

"... What I would discover over the years of much contact with AT was that he was deeply committed to the principles of honesty, fairness, charity, success and peace..."

(See Exhibit K).

R. Sinanan-Singh, a Rising Star engineer, writes:

"... From 1997 through April 2003, while working for Rising Star, I worked on many projects for Capital Performance Inc., and FEDI, including installing security cameras, networks, and computer systems for offices in Canada and New York, designing data centers for offices in the Bahamas and the UAE; travelling to the aformentioned offices; and working on many conferences for Mr. Alishtari, when he hosted group meetings and instructed people on various projects he was working on and gave out updated status of these projects."

Mr. Sinanan-Singh continues:

> "During the time I knew Mr. Mr. Alishtari, I always held him in high respect ... I realized that he sincerely believed that all men had good intentions and trusted people which partly account for his caring and giving spirit..."

(See Exhibit L).

John Storc, a retired United States Naval officer writes, and bookkeeper at Rising Star from 1999 through 2004, writes:

> ... Rising Star was a technology firm and performed many and varied technical projects for Mr. Alishtari.... Mr. Alishtari has always conducted himself in a highly religious and moral manner....After 9/11, many of us

>were slightly suspicious of Muslims but Mr. Alishtari never gave any reason to question his patriotism.

(See Exhibit M).

Kujaatele ("Kooge") Kweli, Mr. Alishtari's brother, has written a detailed, 20 page letter, describing Mr. Alishtari's life and work history, his goals and aspirations, as well as his character. This letter, attached hereto as Exhibit B, sets forth the evolution of Mr. Alishtari's business plans, his efforts to develop a "flat" trade, as well as Mr. Alishtari's personal and character traits. Among Mr. Kweli's comments are the following:

>"... I know my brother to be: a deeply religious and spiritual man, a devoted and loving father and husband, ... an advocate and defender of civil and human rights..., a community leader who advocates world peace..., a loyal American..., a self-made successful businessman..., a peacemaking, charitable, and compassionate human being, a scholar of Muslim history, and an expert on Wall Street underwriting and scriptural banking laws and prohibitions."

(See Exhibit B, p. 1).

Mr. Kweli notes:

>"Rising Star coordinated the successful design and development of the concept (FEDI), in spite of numerous changes to the design requirements necessitated by various political, economic, technical and business challenges ...."

(See Exhibit B, p.10).

In describing the company he ran to develop FEDI, Mr. Kweli writes:

>"For the record, Rising Star staff was comprised of software, hardware, telecommunications and construction designers; engineers specializing in encryption, communications, financial transaction, and web design; human resource trainers, technical writers, and accountants; and lawyers specializing in international law, contract negotiation, public policy analysis and patents. Many of our employees were former military and current consultants to national security agencies on encryption. Our employees were from all races and creeds. About 10% were Muslims."

(See Exhibit B, p.12).

In describing a meeting with Federal and U.S. military authorities who were

interested in pursuing some of the programs developed by Rising Star at Mr. Alishtari's request, Mr. Kweli writes:

> "Rising Star was tasked with the job of putting together a presentation to the General who commanded the facility. It turned out that the system Rising Star developed was an almost perfect match for SouthCom's requirements..."

(See Exhibit B, p.13).

Finally, in describing his brother, Mr. Kweli notes:

> "[Mr. Alishtari] ... is as a respected and a needed voice of moderation and reason in his and the larger Muslim community. He has and can still be a badly needed voice for sanity. All of his life, Alishtari stood for peace through non-violence, he has been an asset to his family, community and his country, and he can still fulfill that role by channeling his genius and business acumen into other worthy economic and charitable sectors, with the help of friends and loved ones like me, and especially his wife and children. We, his family and friends, all stand ready to help in every way possible..."

(See Exhibit B, p. 20).

Wanda Welcome Beans, his half-sister, in a letter attached hereto as Exhibit N, writes:

> "... Tawala ... and my oldest brother... have been role models for their six younger siblings. Tawala is a man who cares very deeply for his family and close friends..."

Some of Mr. Alishtari's character flaws as recognized by Mr. Burg and his brother Mr. Kweli, are what led to the problems that resulted in these convictions. Mr. Alishtari is a visionary but poor judge of character. He has an energetic and compelling personality that he used to raise funds, but he was over-expansive in how he believed he could spend these funds. Mr. Alishtari was trusting of others who expressed their desire to help people, but who took advantage of him and his lofty goals by deceiving him as well as investors to benefit themselves. Mr. Alishtari is a "salesman," prone to exaggeration and overstatement, which lead him to cross the line. Ultimately, Mr. Alishtari was so desperate to try to re-invigorate his business that he complied with – rather than walk away from – the undercover's requests.

These personality traits are reflective of a man who believed that he could help change the world for the better and in so doing, become so wealthy that he could then do further good. As reflected on the tapes between Mr. Alishtari and the undercover,

14

Mr. Alishtari consistently and repeatedly discussed earning so much money from his business ventures that he could use it to help those in need, educate people, provide medical care for the under-served in the Muslim world, as well as address issues of gender discrimination.

In sum, Mr. Alishtar's high-minded, noble, grand plans to succeed on a personal, business and humanitarian level are what resulted in his committing fraudulent, overzealous and irresponsible acts that resulted in these convictions.

### 2.     The Need for the Sentence Imposed

Mr. Alishtari accepts responsibility for his actions. Although there is a need for him to be punished, there is no need for a sentence as harsh as 121 - 151 months. Mr. Alishtari will be well over 60 years old when he is returned to society. He is remorseful for his actions, unlikely to engage in recidivist behavior, in ill-health, and anxious to return to his family.

### 3.     The Kinds of Sentences Available

There is no mandatory minimum sentence that binds the Court's hands in this case and the parties have agreed that either party may seek a "reasonable" non-Guideline sentence.

### 4.     The Sentencing Range

Neither count requires a mandatory minimum sentence. The statutory maximum for Count One is 20 years. The statutory maximum for Count Two, which in effect drives the sentencing guideline calculations in this case, is 5 years. The guideline calculation for Count One is 57-71 months based upon an Adjusted Offense Level of 25 (Level 28, less 3 ). Even if the Court were to up the Offense Level by one level based upon a grouping analysis, under Count One, the defendant would face 63 to 78 months. Under Count Two, the guideline range is 121 - 151 months, but, if viewed independently from Count Two, then the maximum sentence available would be 60 months.

### 5.     Any Pertinent Policy Statement

Defendant is not aware of any policy statement that is pertinent to the issues before the Court.

### 6.     The Need to Avoid Unwarranted Sentence Disparities

Co-defendant Anderson, who engaged in multiple frauds was sentenced by this Court to serve 90 months – 7 months less than the minium he faced as calculated under the sentencing guidelines – after the Government permitted him to plead guilty to only one of the four separate criminal enterprises in which he was involved. Anderson's

15

wife was not prosecuted. His daughter, an accomplice, pleaded guilty pursuant to a cooperation agreement. Unlike Mr. Alishtari, Anderson was a career con man who never intended to build a legitimate business and who stole money from people solely to benefit himself and his family. Mr. Alishtari, on the other hand, misused money and committed fraud, but he spent millions of dollars attempting to build a platform that, if it had succeeded, would have benefitted millions of people around the world.

A sentence of 121 - 151 months for Mr. Alishtari would be disproportionate to the sentence Anderson received based upon his commission of multiple criminal frauds, the intentional, willful, and ongoing nature of his conduct and the fact that Anderson deliberately took advantage of Mr. Alishtari's trust and good will to commit his crimes.

### 7.     The Need to Provide Restitution

Defendant recognizes the need to pay restitution and pursuant to his plea agreement, defendant consented to a forfeiture provision pertaining to Count Two.

### THE PROBATION DEPARTMENT'S RECOMMENDATION

The Department of Probation recommends the minimum guideline sentence of 121 months.

### CONCLUSION

### A.     A Reasonable Sentence

Despite the charges and guilty pleas in this case, the world is no safer from any terrorist act because Mr. Mr. Alishtari is incarcerated. He is not a threat to humanity, not a terrorist-sympathizer, and not anti-American.

Defendant submits that a non-guideline sentence below the 121 month minimum called for under the PSR calculation is appropriate given the circumstances of these particular crimes committed by this particular man. In imposing a non-guideline, reasonable sentence, the Court should consider all of the 3553(a) factors in imposing sentence.

Defendant requests that the Court exercise its discretion and sentence the defendant to a non-guideline, reasonable sentence of 71 months, to be followed by a period of supervised release.

To reiterate, if the defendant had pleaded guilty solely to Count One, the "material aid to terrorism" charge, his guideline calculations would be Level 25 with a guideline range of 57 to 71 months.

If the defendant had pleaded guilty solely to Count Two, the "fraud conspiracy" charge, his original guideline calculations would be Level 31 with a guideline range of 108 to 135 months. However, because the statutory maximum sentence for this crime is 60 months, Mr. Alishtari, would, in effect face a guideline sentence of 60 months. (See U.S.S.G. § 5G1.1(c)(1) and PSR paragraph 111).

By pleading guilty to both counts, the guideline calculations are affected in two ways. First, as a resulting of a grouping analysis, Mr. Alishtari's adjusted guideline range is bumped up to Level 32 and he now faces a guideline sentence of 121 - 151 months. Secondly, pursuant to U.S.S.G. § 5G1.2(d) the guideline calculations of Count Two are no longer capped by the statutory maximum of Count Two and can be applied under Count One.

U.S.S.G. § 5G1.2(d) reads:

> "If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combine sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent required by law."

Mr. Alishtari submits that, in this case, the Court should consider the gravamen of defendant's crimes in determining a sentence that is not greater than necessary. The effect of calculating a guideline sentence as required by U.S.S.G. § 5G1.2(d) is that it mandates consecutive punishment. In reaching a non-guideline determination of reasonableness, the Court does not have to impose consecutive sentences to that extent. Mr. Alishtari is not proposing that the Court re-calculate the Guidelines, which he agreed are applicable in this case. Rather, the defendant is suggesting that under an alternative analysis, in determining the punishment necessary for the harms caused by defendant's wrongs, the Court has a "reasonable" basis to measure them at a lower level.

By not applying the mandatory consecutive provisions of U.S.S.G. § 5G1.2(d) in a non-guideline context, the Court could still take the guideline calculations into consideration as follows:

Under Count One, at Level 25, Mr. Alishtari would face between 57 and 71 months. As a result of grouping, because one additional level is to be added, Mr. Alishtari would face a re-adjusted guideline range of Level 26, and hence a re-adjusted sentencing range of 63 to 78 months.

Under Count Two, at Level 31, Mr. Alishtari would, at first blush, face between 108 and 135 months. However, because the statutory maximum for that offense is 60 months, Mr. Alishtari would face an adjusted guideline range for Count Two of 60

17

months.  Thus, by considering both crimes, adding points for grouping, and by not applying the mandatory, consecutive sentencing provision of U.S.S.G. § 5G1.2(d), the Court could find that a sentencing range of 63 to 78 takes into account both crimes, and in essence, serves as fair and just – and reasonable –  means to measure the severity of Mr. Alishtari's wrongs.

Defendant submits that the Court should, in reaching a determination of what is reasonable, and not greater than necessary, consider that the provisions of U.S.S.G. § 5G1.2(d) *do not need* to be applied in a non-guideline scenario.

A proposed sentence of 71 months would fall in the middle of that range and would still take into consideration the "grouping" of Counts One and Two.

More importantly, a sentence of 71 months would comport with all of the factors mandated by 18 U.S.C. § 3553(a) as discussed at length herein.  Defendant has no means to pay a fine.

### B.   Defendant's Request for Designation

Lastly, defendant respectfully requests that, if possible, the Court recommend that the defendant be permitted to serve his sentence at Ft. Dix,  New Jersey or a facility in the northeast, close to New York City. As referenced in the PSR, defendant's wife and children all reside in the New York City metropolitan area and the family has very limited means.  Traveling to visit the defendant in BOP facility far from New York would impose an undue burden on the family and would effectively make a difficult situation for all involved, much worse.

Respectfully submitted,

_____
Richard H. Rosenberg, Esq.
Attorney for Defendant
217 Broadway, Suite 707
New York, NY 10007
Tel: (212) 586-3838
RichRosenberg@msn.com

/s/ Daniel Parker
_____
Daniel S. Parker, Esq.
Attorney for Defendant
65 West 36th Street, 9th Floor
New York, New York   10018
Tel: (212) 239-9777
DanielParker@aol.com